SEARS, ROEBUCK & Co. ET AL. v. UNITED STATES

**No. 4737.**—Invoices dated Berlin, Germany, December 18, 1936, etc.
    Certified December 19, 1936, etc.
    Entered at Memphis, Tenn., February 3, 1937; New Orleans, La., December 31, 1935; Philadelphia, Pa., May 5, 1937; Boston, Mass., September 13, 1937; etc.
    Entry Nos. 58, 1804, 10866, 3834, etc.

(Decided on rehearing [Reap. Dec. 4695] February 23, 1940)

*James W. Bevans* for the plaintiffs.

*Webster J. Oliver*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

DALLINGER, Judge: These 13 appeals to reappraisement enumerated in the annexed schedule which is marked "A" and made a part hereof, involve the question of the dutiable value of certain shipments of steel wire rope exported from Germany during the period from November; 1935, to August, 1937, and entered at the ports of New Orleans, Memphis, Boston, and Philadelphia. Reappraisements 118692–A and 119113–A arose at the ports of Memphis and New Orleans, respectively, and are test cases in which the appraiser returned export values higher than the invoice prices at which the merchandise was entered. The other cases involve duress entries which cite one or both of said test cases.

This case was originally decided by me on December 21, 1939, in *Sears, Roebuck & Co. et al.* v. *United States*, Reap. Dec. 4695, and is again before me as a result of a rehearing granted the plaintiffs.

All the rope here in controversy is composed of "Standard Plow Steel Wire", ungalvanized, and consists of 6 strands containing 19 wires each, twisted around 1 hemp core. It is described in the invoice covered by appeal No. 118692–A as "Standard Plow Steel Hoisting Rope, 6/19:1 Hemp Core, Regular Lay". A sample showing a cross-section of said rope was admitted in evidence as Illustrative Exhibit A. There are only 8 sizes of rope involved herein, namely, rope with diameters measuring ¼, ⁵⁄₁₆, ⅜, ½, ⅝, ¾, and ⅞ of an inch, and 1 inch.

In the test cases the rope was invoiced at a price in American currency per 100 feet, and entered at the same price, less nondutiable charges. It was appraised in reichsmarks per 100 kilos, less 10 per centum discount, less nondutiable charges, plus reels.

According to the evidence offered by both the importers and the Government, and by stipulation and agreement by and between counsel for the respective parties in open court, it is agreed that there exists no foreign value for the merchandise, for the reason that it is manufactured to meet American specifications, and is entirely different from the wire rope sold in Germany for home consumption; and for the additional reason that the German home market is a controlled and restricted market. The only question at issue, therefore, is what is the correct export value of said merchandise. The plaintiffs contend that the invoiced values represent the correct export values, while the Government is equally insistent that the appraised values represent said correct export values of the merchandise.

The plaintiffs offered in evidence the testimony of Emil H. Rennheck, inventory controller and import buyer for the hardware department of the plaintiff corporation. He testified that in ordering the wire rope in question it was always specified that it must comply with the specifications as set forth by the United States Bureau of Standards; that the instant wire, imported at various ports, was identically the same since his company handles only one grade as shown by its catalog; that the reason it was entered at different ports was in order to make it more easily available to the company's different stores for shipment to its customers; and that from his experience of 20 years in buying a tested wire rope he would say that wire rope made of plow steel under the Bureau of Standards specifications must necessarily always be the same.

At this juncture the plaintiffs offered the invoices and entry papers in reappraisement appeal 118269–A of Montgomery Ward & Co., showing prices approximately the same as those on the invoices and covering precisely similar merchandise as that involved herein. Over objection by counsel for the Government the said invoices and entries were admitted in evidence and marked Collective Exhibit 1.

The witness then testified that in his 20 years' experience all quotations from the German manufacturers have always been per 100 feet

and never by weight, and that he had never known of wire rope being sold in the United States on a weight basis but always by the foot at a list price, less discount.

On cross-examination the witness testified that his company operated 10 mail-order stores and approximately 500 retail stores; that he purchased wire rope for all of said stores during the years 1935, 1936, and 1937; and that he requisitions a year's supply at a time and takes deliveries as they are needed. Asked the meaning of the notation "contract B–9–8a" on the top of the invoice in reappraisement 118692–A, the witness answered as follows:

Merely a certification that we will favor them with our business for wire rope during that period. These contracts are very favorable for us. In other words, at any time we are able to make a better arrangement on better wire rope than we can obtain over there, we are not required to take them.

At the juncture certain copies of contracts for the purchase by Sears, Roebuck & Co. of the involved wire rope from the German manufacturer were verified by the witness and then offered by the Government and admitted in evidence as Exhibits 2 to 6 inclusive.

A pamphlet entitled "Wire Ropes for all Purposes" published at Frankfurt, Germany, and certain illustrations, all illustrating the imported merchandise, were verified by the witness and admitted in evidence as Illustrative Exhibits B, C, and D, respectively.

The witness then testified that in his experience it cost more to manufacture the thin wires than the thick wires; that the contract of March 18, 1935 (Exhibit 3), called for 100,000 feet each of the ⅜-inch and ½-inch size wire, which were the usual quantities of the witness' purchases; that the largest quantity of a given size called for by contract of May 1935 (Collective Exhibit 4) was 30,000 feet; that the largest quantity of a given size called for in contract dated October 1935 (Collective Exhibit 4) was 130,000 feet of the ⅜-inch and 120,000 feet of the ¼-inch; that the contract of March 1936 (Collective Exhibit 4), called for 130,000 feet of the ⅜-inch and 110,000 feet of the ½-inch; that the largest quantity called for in contract of July 2, 1936 (Exhibit 2), was 90,000 feet of the ⅜-inch size; that all of the wire rope constituting the imported merchandise herein was manufactured according to specifications published by the United States Bureau of Standards, a copy of said specifications being contained in the pamphlet which is in evidence herein as Collective Exhibit 7. The witness then testified as follows:

X Q. Now, I show you your purchase contract, B–9–2a, and call your attention to a statement on the bottom, "This order is placed subject to the condition that we can arrange for export and import compensation in connection with this order and payment thereof." What does that statement mean?—A. Frankly, I don't know—probably arranged by our Berlin man.

X Q. But this contract went out from Chicago, didn't it?—A. It was approved here.

X Q. But you made the purchases, did you not?—A. We specified the quantities.

In this connection it is to be noted that in the official papers in reappraisement 118692–A there is a declaration signed by the German manufacturer, the pertinent portion of which reads as follows:

We, Carl Nieberg & J. Assion, do hereby declare that the goods described in the attached invoice have been sold for export to the United States and that we, Dortmunder Drahtseilwerke, Wohlfahrt & Liesenhoff Gmb.H., Dortmund, have received or expect to receive by reason of the shipment of such goods to the United States, the following sums, benefits, and/or privileges:

1. Marks 1,735.53 subject to special exchange regulations of the German Government or a department, office, or agency thereof. Such marks are to be received from a controlled account designated: ASKI

Moreover on the face of the consular invoice duly sworn to by the German agent of the exporter appears the following notation: "Freight and insurance to be paid by purchaser. Payable in German 'AskiMarks'."

The witness then testified that early in 1937 the prices of steel went up due to armaments; and that he had nothing whatever to do with making payments for the merchandise purchased.

On redirect examination the witness testified that the increases in the price of wire rope in 1936 and 1937 were shown in the invoices herein; that the specification of 85,000 feet of ½-inch wire rope in Exhibit 2 was not a fixed quantity, but that the company had the privilege of carrying any part of the said 85,000 feet to wire of other measurements; that in each of the subsequent orders sent abroad a definite number of reels of wire rope of the particular size desired was specified to be shipped to a definite port in the United States; that the expression "black plow steel wire rope" correctly described the wire rope imported by his company, the word "black" meaning wire rope not coated or galvanized and having oil protection; and that said term "black" was interchangeably used with the word "standard."

On recross-examination the witness testified that he could not say whether or not any of the contracts (Exhibits 2 to 6, inclusive) had been canceled; and that about 95 per centum of the wire rope sold by the witness' company was used on the farm for pulling stumps or logs or hoisting hay, etc.

At the close of the witness' testimony counsel for the plaintiffs offered the affidavit of a director of the foreign manufacturing company from whom this wire rope was purchased, which was admitted in evidence as Collective Exhibit 8. In this affidavit the affiant states that he is familiar with the manufacture of wire rope both for consumption in Germany and for export to the United States; that the latter is made in accordance with United States specifications and is different from the wire rope manufactured for home consumption in

Germany; that the witness' company has no exclusive agreement with Sears, Roebuck & Co., but may sell at the same price to anyone desiring to purchase; that the wire rope manufactured for home consumption in Germany is sold at prices per 100 kilos; and that the wire rope sold for export to the United States is sold at prices per 100 feet.

Counsel for the Government then moved to dismiss the appeals on the ground that the importers had not overcome the presumptively correct appraised value. The motion was denied by the court and exception allowed the Government.

Counsel for the Government then offered in evidence a report of Customs Agent Malcolm Gerry, dated February 27, 1939, which, over objection of counsel for the plaintiffs was admitted in evidence as Collective Exhibit 9.

The said report shows payments for the instant merchandise in reichsmarks, the date of each payment, the rate of exchange, and the corresponding amount in dollars as follows:

| Contract No. | Manufacturer's name. | Date of invoice | Manufacturer received in reichsmarks | Date of payment | Rate of exchange | Amount in dollars |
|---|---|---|---|---|---|---|
| B-9-8a | Dortmunder | 12/ 7/36 | 1735. 53 | 1/ 7/37 | $0. 2668 | 462. 52 |
| B-9-8 | Dortmunder | 11/17/36 | 888. 93 | 12/10/36 | 0. 257611 | 237. 79 |
| B-9-8a | Dortmunder | 2/10/37 | 603. 82 | 3/18/37 | 0. 26850 | 162. 13 |
| B-9-2a | Dortmunder | 3/26/36 | 345. 00 | 1/ 2/36 | 0. 29 | 100. 05 |
| B-9-8 | Dortmunder | 5/ 7/36 | 161. 59 | 2/ 4/36 | 0. 29 | 46. 86 |
| 4760 (Order) | Dortmunder | 9/19/36 | 1884. 93 | 10/14/36 | 0. 2630 | 495. 74 |
| B-9-8a | Dortmunder | 12/31/36 | 887. 68 | | | |
| B-9-8a | Dortmunder | 12/31/36 | 161. 85 | 2/ 8/37 | 0. 2675 | 280. 75 |
| B-9-11 | Dortmunder | 5/18/37 | 405. 62 | 4/26/37 | 0. 30136 | 122. 24 |

Counsel for the Government also offered a report of the same customs agent, dated March 10, 1939, which, over objection of counsel for the plaintiffs, was admitted in evidence as Exhibit 10. This report states that the information contained in Collective Exhibit 9 was obtained from A. A. Sibbald, manager of the importing division, and J. F. Mayer of the accounting division of Sears, Roebuck & Co. at Chicago, Ill.

The Government also offered in evidence a report, dated June 26, 1935, signed by Acting Treasury Attaché Paul Hermes, which was admitted in evidence as Exhibit 11. This report deals with steel wire ropes manufactured and shipped by Kloeckner-Werke A. G., Abteilung Eisen-und Drahtindustrie, of Duesseldorf, Germany, which concern exported steel wire rope to the Kloeckner Steel Corporation of New York. Attached to the report are the details of nine shipments giving the weight and selling price per 100 feet, less 10 percentum trade discount delivered c. i. f. Boston. Also attached to said report is a table showing the minimum export prices for wire

ropes established by the German Wire Rope Export Association. The following are the pertinent statements:

\* \* \* The merchandise is sold on the basis of an export list showing prices in Reichsmark, and if the Berlin quotation for the dollar at the time of shipment varies from the quotation prevailing on the date of acceptance, the dollars and cents price is adjusted accordingly.

\*     \*     \*     \*     \*     \*     \*

Mr. Derenbach was noncommittal on the question whether or not any payments were received by the company on account of scrip (blocked funds) in addition to the price paid by the importer, and he pleaded that under the instructions issued to exporters by the German Ministry of Economics he was not permitted to furnish any information on this question. I noticed, however, that a circular letter from the association of wire rope exporters attached to his copy of the association's export price list \* \* \* stated that this list was predicated upon the receipt of such additional payments by the exporters. It must be assumed, therefore, that the company received such additional payments, although the said instructions issued by the German Ministry of Economics make it impossible to ascertain the extent of such payments.

(*3*) *Prices.* Export prices are now fixed by the association of wire rope exporters \* \* \* of which the company is a member. \* \* \*

A complete copy of the association export list was obtained subsequently by a visit to the association's office at Essen \* \* \*. A copy of the said list is submitted herewith, marked exhibit "A." It is described as a list of minimum prices. The association does not offer and sell on its own account, but all selling is done by the manufacturers and exporters themselves. Incidentally, Mr. Roehl confirmed that the list prices are predicated upon the receipt by the exporters of payments on account of scrip in addition to the selling prices paid by the foreign buyers. The list has been in effect since July 1, 1934. The prices are in Reichsmark per 100 kg., delivered f. o. b. Antwerp, Bremen or Rotterdam. The association terms of sale permit the allowance of a trade discount of 10% from list prices to dealers only, and an additional 5% commission to selling agents. \* \* \*

The company sold the wire ropes in question on the basis of the said association list, but converted the prices into dollars per 100 feet. It allowed the importer the 10% trade discount provided by the terms of the association. It allowed further the 5% selling commission mentioned above, which the importer deducts as an additional discount on his remittances. It further allows the importer a cash discount of 2% in all cases where the Kloeckner Steel Corporation furnishes a letter of credit. \* \* \*

\*     \*     \*     \*     \*     \*     \*

(*4*) *Usual Wholesale Quantity.* The quantities usually sold by the company for exportation to the United States vary between 3,000 and 4,000 feet per order.

The Government also offered in evidence a certified photostatic copy of a report of said Paul Hermes, dated August 9, 1935. Inasmuch as this report deals entirely with sales of wire rope in Germany for home consumption, it is in no way relevant to the issue involved herein.

The Government also offered in evidence the report of Treasury Attaché Erwin G. May, dated April 1, 1936, which was admitted in evidence as Exhibit 13. Apparently this report deals entirely with sales of steel wire rope in Germany for home consumption, the home

market being a restricted and controlled one. The only thing in the report which can have any possible bearing on the issue involved herein is the statement that a visit would be made to the German Wire Rope Export Association to ascertain if there had been any change in the export list of July 1, 1934, a copy of which was contained in the report of June 26, 1935, signed by Paul Hermes (Exhibit 11). Apparently no change was discovered.

The Government also offered in evidence a certified copy of the report of John P. Griebel, Treasury representative, dated June 29, 1936, which was admitted in evidence as Exhibit 14. In this report it is definitely stated that at the time of said report there had been no change in the export prices since the report of June 26, 1935 (Exhibit 11), the terms and conditions stated on page 7 of that report being still effective. In the report also occurs the following statement under the heading of "Export Value":

The basic prices shown are per 100 kgs fob Antwerp, Bremen or Rotterdam and are used as a guide. The manufacturers may sell ex works, fob seaport or C. I. F. deducting from the fob prices to arrive at an ex-works price or adding to obtain a C. I. F. price.

Copies of all orders are sent to the association and the latter checks these to see that prices are adhered to. An official of the association also visits the manufacturers from time to time to check the firms export records.

The entire remainder of the report deals with the foreign value of wire rope in Germany sold for home consumption, and it is therefore not pertinent to the issue involved herein.

The Government also offered in evidence the report of Treasury Representative Charles Kruszewski, dated October 15, 1938, and admitted in evidence herein as Exhibit 15. This report relates to the market value of steel wire rope manufactured by Dortmunder Drahtseilwerke Wohlfahrt & Liesenhoff GmbH. of Dortmund, Germany, manufacturer and exporter of all the steel wire rope involved in the instant appeals. The pertinent portions of this report are as follows:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

On July 12, 1938 I visited the Dortmunder Drahtseilwerke Wohlfahrt & Liesenhoff G. m. b. H., Dortmund, Germany, where I was informed that the sales records and price lists were kept by the Wire Rope Export Association in Essen, Germany.

On July 13, 1938, and September 12, 1938 I visited this association and consulted Manager Carl Roehl, who furnished the following information:

The German Wire Rope Export Association minimum export price-list, attached to the report of Paul Hermes, No. 79/35 is dated July 1, 1934. This price list remained in effect from that date until January 9, 1937. Beginning with January 10, 1937 members of the association started to sell at higher prices owing to increasing world market prices. The export price list of July 1, 1934 was suspended, but used as a guide. Prices fluctuated and were about 10–20% higher than the old list prices until they were again firmly established in a new price-list No. 4, dated May 10, 1938, a copy of which is forwarded herewith marked exhibit "A." It will be noted that compared with old price list of July 1,

1934 prices in new price-list are about 13% higher. From these prices manufacturers allow discounts up to 15%. This fact could not be verified because Manager Roehl did not feel inclined to place his sales records at my disposal.

I requested Mr. Roehl to permit me to make a tabulation of sales during the period of from January 10, 1937 to May 9, 1938, the period during which manufacturers did not have to adhere to any export price-list. After protracted negotiations Mr. Roehl picked a few sales from his elaborate records, but would not permit me to copy them. He finally consented to have his stenographer copy them and send them to my hotel. These hand-picked sales are forwarded herewith marked Exhibit "B," for whatever value they may have.

\*　　\*　　\*　　\*　　\*　　\*　　\*

\* \* \* The Dortmunder Drahtseilwerke Wohlfahrt & Liesenhoff G. m. b. H. Dortmund informed me that they did not issue any price-list.

It should be noted that the order for the shipments under the below-mentioned Berlin consular invoices was placed on January 15, 1937 at higher prices not following any price-list:

No. 1219 certified on April 14, 1937 Manufacturer: Dortmunder Drahtseilwerke.
No. 1783 　" 　 " May 26, 1937 　 " 　 　 　 " 　 　 　 "
No. 3181 　" 　 " Aug. 30, 1937 　 " 　 　 　 " 　 　 　 "

Upon a reconsideration of the record herein, and in view of the arguments presented by counsel at the rehearing held before me on February 2, 1940, I am satisfied that I was in error in holding the price list of the German Steel Wire Rope Export Association to constitute a free offer of sale to all purchasers of the wire rope in question for export to the United States and that the appraiser was justified in basing his appraisement upon the minimum prices set forth in said price list. This price list was evidently merely for the benefit of German exporters who belong to the said association in fixing their prices to their customers and was never offered to American purchasers as an offer of sale.

Moreover, there is no evidence anywhere in this record of any sales at the said minimum prices to any purchaser. The only sales in the record of steel wire rope of any kind are those to this importer, to Montgomery Ward & Co., and to the Kloeckner Steel Co., all of which sales were made in dollars per unit of 100 feet and not in reichsmarks per 100 kilos.

Moreover, it appears from the evidence that the steel wire rope sold to the Kloeckner Steel Co. was galvanized and therefore not similar to the merchandise herein.

Furthermore, the fact that according to the Treasury attaché's report transmitting the German price list in question, it is stated that there was a trade discount from said list of 10 per centum and a selling commission of 5 per centum which clearly indicates that the said price list was not followed in making sales of steel wire rope for export to the United States.

Inasmuch, therefore, as the plaintiffs herein have offered in evidence the only sales of the steel wire rope in question, I am now convinced

that they have sustained the burden of proving an export value for said merchandise different from the appraised value.

Counsel for the Government stresses the point that the German manufacturer was actually paid in reichsmarks and not in dollars, and in my former decision I called attention to the statement on the invoice to this effect as contradicting the plaintiffs' contention that the transaction was in American dollars. Naturally such payment in any event would be made in a number of reichmarks equivalent to the agreed upon purchase price in dollars at the then current rate of exchange. I am now convinced that said conversion of currency does not contradict the fact that both the offer of sale and the sale of the instant merchandise were as a matter of fact in dollars per 100 feet. Moreover, in my opinion the fact that the plaintiffs were able to purchase German marks at a less rate in American dollars than the current rate of exchange at the time of importation is immaterial.

On all the facts and the law I therefore find that the dutiable values of the steel wire rope constituting the imported merchandise at bar are the entered values thereof less any additions made by the importers upon entry because of advances made by the appraiser. Judgment will be rendered accordingly.