(Reap. Dec. 11103)

D. C. ANDREWS & CO. OF LA., INC., ET AL. v. UNITED STATES

Entry No. 6890, etc.

(Decided November 15, 1965)

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the plaintiffs.

*John W. Douglas,* Assistant Attorney General (*Harold L. Grossman,* trial attorney), for the defendant.

FORD, Judge: Involved herein are 27 appeals for reappraisement consolidated for trial, covering 27 entries of Belgian steel wire rope, exported from Belgium to the United States. The merchandise, made to United States specifications, was purchased by the Heartland Trading Co. of New Orleans, La. (hereinafter referred to as Heartland), from Emile Regniers & Cie of Charleroi, Belgium (hereinafter referred to as Regniers), and entered for consumption at the port of New Orleans, prior to the effective date of the Customs Simplification Act of 1956.

The merchandise was appraised on the basis of United States value, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, 74 Treas. Dec. 17, T.D. 49646.

The plaintiffs claim the proper basis of dutiable value is export value for such merchandise under section 402(d) of the Tariff Act of 1930 and that the unit values, as invoiced and entered, properly represent the said export values.

The plaintiffs also claim, alternatively, that similar merchandise was freely offered for sale to all purchasers in the country of exportation for export to the United States fulfilling all requirements to establish export value under section 402(d), *supra*.

### THE STATUTES INVOLVED

The pertinent portions of section 402 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, are set forth below:

SEC. 402. VALUE.

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

    (1) The foreign value or the export value, whichever is higher;

    (2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

      \*      \*      \*      \*      \*      \*      \*

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

SEC. 500. DUTIES OF APPRAISING OFFICERS.

(a) APPRAISER.—It shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe—

    (1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or *estimating* the value thereof by all reasonable ways and means in his power, any statement of cost or cost of production in any invoice, affidavit, declaration, or other document to the contrary notwithstanding; [Emphasis added.]

In the instant case, and according to the aforesaid statutes, the appraiser was obliged to find value "* * * by all reasonable ways and means in his power * * *" first, to find foreign value for the merchandise; finding none, export value for *such* merchandise came in order, in the absence of which, value for *similar* merchandise became proper. Only thereafter could United States value be considered. Absence of a foreign value was stipulated at the trial.

The record is comprised of the testimony of three witnesses and 14 documentary exhibits for the plaintiffs, and two reports of a customs agent, exhibits for the defendant.

Albert Deben, commercial officer of the Belgian Consular General's office, New Orleans, La., associated there over 12 years, testified for the plaintiffs as follows: His duties were to promote the sale of Belgian products, primarily by finding importers who might purchase their goods in the southern area of the United States; he was not an expert in any particular field, but knew the general category of merchandise offered for sale by Belgian firms to United States importers. His office aided Belgian exporters and manufacturers to find outlets and buyers for their products in the United States. When an inquiry from an American firm for a particular product came in, it would be forwarded to the Belgian foreign trade office in Brussels, where it was publicized. Thereafter, Belgian firms responded with offers to supply such products to the American firm. Copies of nine letters from Belgian firms, dated between April 23, 1954, and May 12, 1955, offering various sizes of Belgian steel wire rope for export to the United States, were identified by Mr. Deben as communications received by his office in response to American inquiries about a source of supply of such merchandise. Some of the letters were from mills, others were from exporters. These letters (received as plaintiffs' collective exhibit 1) were offers of steel wire rope by eight different Belgian firms to prospective purchasers in the United States or to the "Consulate Office" to convey to such prospective purchasers as follows:

| Date of offer of letter | Belgian firm making offer | Offer made to |
|---|---|---|
| 4-23-54 | Corderies J.-B. Ligny a Gilly | Little Mule Corp., Fort Lauderdale, Fla. |
| 5-4-54 | Cie Sud-Americaine des Minerais et Metaux Sudamin | Belgian Consulate General, Commercial Office, New Orleans, La. |
| 10-11-54 | Laurent Freres | Peden Iron and Steel, Houston, Tex. |
| 11-9-54 | Usines Gonzalez Cock, S.A. | " |
| 11-25-54 | Societe Anonyme des Corderies Deltenre, Briart & C. Nicaise | " |

| | | |
|---|---|---|
| 11–25–54 | Comptoir Commercial Meersmans | Belgian Consulate General, Commercial Office, New Orleans, La. |
| 12–4–54 | " | |
| 3–30–55 | S. A. Vertongen-Goen | Hemisphere International Corp., New Orleans, La. |
| 5–12–55 | Societe Anonyme "CITALO" Lodelinsart | Belgian Consulate General, Commercial Office, New Orleans, La., a/c Hemisphere International Corp. |

Counsel for plaintiffs offered the aforesaid letters as evidence of export value of the merchandise in controversy.

Mr. Deben stated that when such offers were received, his office would convey them to the inquiring American firm and also try to determine from any results whether their efforts to promote trade were successful.

Clay Calhoun, witness for the plaintiffs, testified that he was the sole owner in 1952 through 1956 of Heartland, the importer of the steel wire rope covered by the entries involved herein; that the company was no longer operative, having terminated its operation the end of 1956 or early 1957. Its business was importing and exporting. During 1954 and 1955, the business was run by an office manager, Paul Hoots, with whom he kept daily contact. He said that he was cognizant of all important transactions; that, before any transaction was finalized, his approval was sought by Mr. Hoots and that he (Mr. Calhoun) personally handled the buying and selling of wire rope imported by Heartland.

Mr. Calhoun stated that he first became interested in steel wire rope in 1953; that a dredging company, with which he was associated also, the Stevenson Co., was using considerable wire rope; that he had noticed a roll of steel wire rope in the Belgian trade exhibit in New Orleans, La., on the same floor as his own office; he inquired about the price of steel wire rope, the various sizes, and whether it could be made to American specifications. He learned from the Belgian commercial office that the manufacturer of the steel wire rope was "LeLis," and contacted that firm about prices; that he was interested because if the merchandise could be bought at a lower price from a foreign market, the Stevenson Co. could use it, and Heartland might find an item to market in the United States.

Mr. Calhoun stated that there are Federal specifications for steel wire rope with which he was generally familiar. He identified a booklet entitled "Federal Standard Stock Catalog, Section IV (Part 5) Federal Specification for Rope; Wire, RR–R–571a," dated May 8, 1945 (plaintiffs' exhibit 2), which, to the best of his knowledge and belief, was in effect in 1953 and 1954. He said that there were speci-

fications for 860 variations of steel wire rope in sizes between 0 and 2 inches, that his firm dealt in sizes $\frac{3}{8}$, $\frac{1}{4}$, $\frac{5}{16}$, $\frac{5}{8}$, and $\frac{7}{8}$ inches.

Continuing his testimony, the witness stated that Heartland intended to deal in sizes up to about an inch and a quarter, and explained that the larger sizes were used more slowly because they did not break as easily; that the biggest demand was for sizes up to $\frac{7}{8}$ of an inch. Various uses of the wire rope require various sizes.

Originally, Heartland's only objective was to market through distributors, but after the said first importation, it responded only to open bids to the State of Louisiana for wire rope that called for future delivery; immediate delivery was not possible, unless it was for a size which Heartland happened to have in stock in the foreign trade zone; all subsequent importations thus were sold to the State of Louisiana pursuant to accepted bids. The witness stated, "I think the State of Louisiana was about the only outlet we had other than the disposal of these materials, the original shipment that we had in the Free Trade Zone."

On acceptance of its bid by the State of Louisiana, Heartland would contact the exporter in Belgium for current quotations. At this point, the witness identified plaintiffs' exhibits 3 to 10, inclusive, being communications and other documents exchanged among the parties involved herein and showing the course and manner of the steel wire rope transactions at bar, except the first.

Mr. Calhoun testified that Heartland did not have any binding exclusive agreement with Regniers to be its sole distributor in the United States; and while he thought there was an understanding that Regniers could do business only with Heartland in the port of New Orleans, "We didn't have any binding agreement with them." He stated that he knew Regniers offered steel wire rope to other purchasers in the United States; and he knew that, from April 1954 through December 1955, Belgian mills were also offering steel wire rope for export to the United States directly to any purchaser who wished to buy.

He identified (plaintiffs' exhibit 11) a letter of Regniers, dated December 11, 1953, addressed to Heartland, which plaintiffs' counsel offered as indication of the transaction between the exporter and importer herein of steel wire of standard specifications, freely offered, in support of plaintiffs' claim of export value. Heartland received no price concessions from Regniers, and it could have purchased the merchandise at lower prices directly from the mills, but the mills desired a letter of credit, whereas Regniers would ship on open sight draft whereby Heartland would not need to pay until the merchandise actually arrived. LeLis, a Belgian manufacturer, offered his firm wire rope of United States specifications at lower prices than Regniers, but the terms and conditions of payment were less favorable. Other mills

also had lower prices, but less favorable payment terms than Regniers. He stated that the market for steel wire rope fluctuated and was in a general upward trend from April 1954 through December 1955; that Regniers issued pricelists and, on at least three or four occasions, notified Heartland of price increases; he stated that Heartland's profit on the imported merchandise was in excess of 8 per centum, but could give no figures concerning his firm's general operating expenses.

Plaintiffs here offered into evidence exhibit 12, affidavit of A. Keller, Chef de Service of Emile Regniers & Cie, exporter of the merchandise at bar, dated March 19, 1963, with pricelists and attachments, purporting to show freely offered steel wire rope in Belgium for export to the United States on the dates of exportation pertinent hereto; that S. A. Marcel Vermeire was the manufacturer of the steel wire rope at bar; that Regniers did not grant Heartland any exclusive territory; and that the prices charged Heartland were the prices offered generally to all purchasers.

Plaintiffs' exhibit 13 was received merely as clearer and more readable copies of the attachments in exhibit 12, *supra*.

Plaintiffs' exhibit 14 was offered and received in evidence, being a copy of the original invoice covering the first importation of steel wire rope into the foreign trade zone, heretofore mentioned.

Paul Hoots, office manager for Heartland, testified for the plaintiffs that, in 1954 and 1955, he was familiar with the importations herein of steel wire rope from Belgium. He stated that he handled quotations and bids and consulted with Mr. Calhoun in every case regarding pricing procedure; that he computed gross profits on the steel wire rope imported from Regniers at an average generally "somewhere around 21, 22 percent."

At the conclusion of the plaintiffs' case, defendant offered into evidence (defendant's exhibit A) a duly certified report of the Assistant Supervising Customs Agent of the port of New Orleans, La., dated October 19, 1955, together with pertinent exhibits. This report recites, for the reason set forth in my discussion of exhibit B, *infra*, that Regniers was the manufacturer of the steel wire rope at bar and states that exclusive sales rights were granted by Regniers to Heartland, precluding export value and necessitating resort to United States value as a basis of appraisement. Attached to said report is a letter of the Supervising Customs Agent at New York who interviewed Regniers, U.S.A., in New York, described as a separate entity from Regniers, Belgium.

Defendant's exhibit B was received into evidence, it being a report of Assistant Supervising Customs Agent Hooe, dated New Orleans, La., May 11, 1956, verifying that the manufacturer of the involved steel wire rope in the foreign trade zone, New Orleans, was Morrel

[*sic*] Vermeire, not Regniers; and also indicating that the appraiser was seeking further information to establish United States value, if possible, on certain wire rope, imported by Heartland from Belgium.

Our primary inquiry in the case at bar is to determine from the record whether or not an export value for such or similar merchandise existed in Belgium at the time of exportation to the United States. Foreign value was excluded by stipulation of counsel at the opening of the trial. Only export value, therefore, requires our attention. If such export value did exist, the appraisement on the basis of United States value was erroneous.

It is well settled that the plaintiff in a reappraisement controversy has the burden of overcoming the presumption of correctness attaching to the appraisement, in this case, the appraisement made on the basis of United States value. The plaintiffs' burden is twofold. They must prove that the instant appraisement made on a basis of United States value is erroneous and also prove the proper dutiable export value which they claim by establishing every element required by section 402(a) of the Tariff Act of 1930. *United States* v. *Malhame*, 19 CCPA 164, T.D. 45276; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502; *United States* v. *E. R. Squibb & Sons et al.*, 42 CCPA 23, C.A.D. 564; and numerous cases cited therein.

Failing in this burden to establish any one of the required statutory elements, the appraisement as made on the basis of United States value will prevail under the presumption of correctness provision of the law. *Arditi* v. *United States*, 50 CCPA 49, C.A.D. 818; *Brooks Paper Co.* v. *United States*, 40 CCPA 38, C.A.D. 495.

The plaintiffs herein argue that there was an export value for both *such* merchandise offered and sold by Regniers to them and to all other purchasers, and also for *similar* merchandise freely offered by at least eight other exporters and mills in Belgium for export to the United States.

The predominant point urged by the Government, the defendant herein, is that Regniers of Belgium had granted to Heartland of New Orleans, La., an exclusive contract to distribute Belgian steel wire rope in the States of Louisiana, Mississippi, and Alabama. A binding agreement of this nature, being restrictive of a free market, would destroy the vital statutory element required that such merchandise be freely offered to all purchasers in the ordinary course of trade in Belgium for export to the United States. *United States* v. *Malhame & Co.*, 24 CCPA 448, T.D. 48911.

The plaintiffs challenge the existence and validity of this alleged exclusive agreement. On this point, examination and interpretation

of the pertinent exhibits and testimony of record, in the light of the then current circumstances, must be made.

In the course of its said business, Heartland exchanged communications with the Louisiana Department of Highways and Regniers, Belgium. Plaintiffs' exhibits 3 to 10, inclusive, illustrate a representative portrayal of the business operation herein from the bids on steel wire rope, through fulfillment of orders at rising prices.

In the course of business also, three letters were exchanged among the parties involved in which the Government contends the terms of an exclusive contract are spelled out (defendant's exhibit A). This being challenged by the plaintiffs, we reproduce them in full for close study:

> STAMP
> RECEIVED
> SUPERVISING CUSTOMS AGENT
> JUNE 13, 1955
> NEW ORLEANS 16, LA.

HEARTLAND TRADING CO.
306 International Trade Mart
New Orleans, U.S.A.

February 4, 1954.

Mr. R. Huart, Director,
Belgian Commercial Office,
201 International Trade Mart
New Orleans 12, Louisiana

Dear Mr. Huart:

Confirming my conversation with you, we are willing to accept the offer of Emile Regniers & Cie. based on their CIF proforma invoice dated December 11th, 1953, under the following conditions:

1.) That we be their exclusive representatives and the representatives of the supplying manufacturers for the States of Mississippi, Louisiana and Alabama.

2.) That the initial shipment be in accordance with the CIF proforma invoice dated December 11, 1953.

3.) That payment be modified from "cash against shipping documents" to 50% in 120 days from arrival of the shipment, the remaining 50% in 180 days from the arrival of the shipment.

4.) That the shipment be made to us at the Free Trade Zone, New Orleans, La., and documents be sent to the Louisiana Bank & Trust Co. with instructions for them to issue warehouse receipts, 1 receipt for each reel, with authorization for us to accept delivery of one or all reels from date of arrival of same, payment, of course, being made at the time of releasing each reel, which payment Regniers would promptly receive from the bank. It would be our guarantee that we will release 50% in a maximum time of 120 days after arrival and the remaining 50% within 180 days after arrival.

5.) That the interest rate on such carrying charges be not more than 5% per annum.

6.) That promptly upon accepting these conditions, Emile Regniers & Co. will send us two 6'' samples of each type of reel as covered in their CIF proforma

invoice dated December 11th, 1953, the purpose of this being that the samples arrive first, so that our salesmen may immediately start selling, based on arrival of the reels.

It is very possible that we may sell the entire quantity covered by the proforma invoice prior to arrival of the shipment, which would mean that the documents would be paid promptly upon arrival of the merchandise and we would then be in a position to place our succeeding orders.

The prompt shipment of the samples is very important to us.

We think that under the above terms and conditions, we can work out a very satisfactory and profitable business for our respective firms.

Very truly yours,

HEARTLAND TRADING COMPANY

/t/ Clay Calhoun

cjc/e

Encl. Order No. IMP–733

N.B.—We prefer all of the above steel wire rope to be treated hot with heavy viscous straight mineral product that will penetrate the strands when hot but not drop from the rope when at working temperature.

STAMP
RECEIVED
    JUNE 13, 1955
SUPERVISING CUSTOMS AGENT
    NEW ORLEANS 16, LA.

Copied 10/19/55
        by rl

HEARTLAND TRADING CO.

306 International Trade Mart
New Orleans 6, U.S.A.

March 3, 1954

AIRMAIL

Messrs. Emile Regniers & Cie.,
Siege Social : 9, Quai de Flandre,
Charleroi, Belgium

OUR ORDER IMP–733
STEEL WIRE ROPE

Dear Sirs:

We were today informed by Mr. R. Huart, Director of the Belgian Commerical Office, New Orleans, that he is in receipt of a letter from you dated February 16th in connection with our above order for Steel Wire Rope, calling attention to the fact that the prices indicated therein are shown as "CIF NEW ORLEANS", whereas they are actually equivalent to "FOB ANTWERP" as indicated in the separate Proforma Invoice dated December 1, 1953, sent by you.

We regret this oversight on our part and hasten to correct same herewith. Therefore, kindly correct our order No. IMP–733 to read as follows:

Price per 100# in USC.
CIF NEW ORLEANS, FPA
INSURANCE, WAR RISK INCLUDED.

| | |
|---|---|
| Item 1 | $11.51 |
| Item 2 | 11.10 |
| Item 3 | 11.78 |
| Item 4 | 11.33 |
| Item 5 | 12.24 |
| Item 6 | 11.83 |
| Item 7 | 12.24 |
| Item 8 | 13.01 |
| Item 9 | 12.60 |
| Item 10 | 13.01 |
| Item 11 | 13.74 |
| Item 12 | 14.60 |

Mr. Huart suggested that we communicate with you directly hereafter, after having set in motion the initial operations between our respective firms, and we would appreciate your contacting us directly from now on, to expedite and facilitate matters.

We now await your early news concerning the status of our order, on the basis of the conditions outlined in our letter of February 4, 1954 to Mr. Huart, and, of course, with the understanding that the prices indicated in our original order have been amended to read as listed in this letter.

Very truly yours,

HEARTLAND TRADING COMPANY

wae:e    c/o Mr. Huart, N.O. La.

/t/ Clay Calhoun

Copied 10/19/55
    by rl

EMILE REGNIERS & CIE
        S.P.R.L.
    Charleroi
    (Belgique)
Metals. CB/FE

CHARLEROI (Belgique), March 13th 1954
9, Quai de Flandre
Messrs. Heartland Trading Company.
306, International Trade Mart
New-Orleans 12
Louisiana—USA.

Dear Sirs,

This is to refer to the letter you sent on the 4th of February to Mr. R. Huart, the Belgian Trade Commissioner in New-Orleans, and we acknowledge receipt of your letter of the 3rd inst.

We have amended, in conformity, your order no. IMP–733 which we confirm having definitely entered, with our best thanks, for shipment to take place in accordance with our CIF pro forma invoice dated December 11th 1953.

We also confirm our agreement to the various points raised in your letter of the 4th of February.

With regard to payment, we are however of the opinion that the interest is to run as from date of shipment. As far as warehouse charges are concerned, we take it for granted that same are entirely for your account.

*Sampling set.*—This is having our best attention but such samples can only be forwarded as and when the goods are being manufactured. In any way, you may be assured that we will follow this matter up very closely and see to it that same are in your hands prior to arrival of the shipment, so that your salesmen may immediately start selling based on arrival of the reels.

We have no doubt that this first consignment must give you full satisfaction and will be the forerunner of a very profitable turnover.

Looking forward to hearing favourably from you and assuring you of our best attention at all times, we remain, Dear Sirs,

Yours faithfully,
pr Emile Regniers & Cie
(Signed)_____
/t/C. Bertinchamps Chef de Service

Copied 10/19/55
by rl

It is observed that the Heartland letter of February 4, 1954, is addressed to R. Huart, director of the Belgian commercial office in New Orleans, not to Regniers, the contemplated party to the contract. Of the six enumerated proposals therein, the first, that Regniers designate it (Heartland) as its exclusive representatives, and also representatives of the supplying manufacturers, not identified, is vague for contractural acceptance. Other of the proposals were modified by further correspondence. Finally, the following words in Regnier's letter, dated March 13, 1954, are urged by the Government as constituting an acceptance of a binding contract—

We also confirm our agreement to the various points raised in your letter of the 4th of February.

This court cannot accept this contention. The recitation of "various points" implies indefiniteness. The terms are not specific. Compliance with the elementary law of contract is lacking. In *Chiapparelli* v. *Baker*, 252 N.Y. 192, the alleged contract was avoided where the nature or extent of performance was too indefinite for legal enforcement.

Concerning legal acceptance, *White* v. *Corlies et al.*, 46 N.Y. 467, held that an acceptance to be effective must be an acceptance of the offer in its exact terms. Further apropos herein, a proposal on the part of an offeree to accept the offer with a stated slight change or an intended acceptance subject to some condition is equivalent to a rejection of the offer, *Glens Falls Lumber Co., Inc.* v. *Ryerson*, 175 A.D. 769; 162 N.Y.S. 427.

Finally, on the subject of exclusive contracts, applicable here, is the mutuality rule which, in substance, holds that where there is nothing in the agreement compelling a party to purchase anything, there is no mutuality of obligation. See *Smith* v. *Diem et al.*, 223

A.D. 572, affirmed 249 N.Y. 590; *Oscar Schlegel Manufacturing Company* v. *Peter Cooper's Glue Factory*, 231 N.Y. 459.

The testimony in the record supports the nonexistence of a binding exclusive agreement. Mr. Calhoun, sole owner of Heartland, also testified that he had no legally binding agreement with Regniers. That Mr. Hoots, an employee of Heartland stated to Mr. Hooe, customs agent, that it had an exclusive agreement is not significant. A. Keller, Chef de Service of Regniers stated, in his affidavit (plaintiffs' exhibit 12), that Regniers did not limit its sales or offers of the merchandise to Heartland. Pricelists and offers in evidence support this position.

Based on the foregoing, it is the opinion of this court that there existed no restrictive contract between Regniers and Heartland, which now leads us into the next inquiry, the plaintiffs' establishment by the record herein of export value under section 402(d) of the tariff act, *supra.*

There is reliable and sufficient proof in the record to establish statutory export value for *such* merchandise, the steel wire rope at bar. Plaintiffs' exhibit 12, the affidavit of A. Keller, Chef de Service of Regniers, with pricelists and offers, represents facts in evidence supplied by a qualified and authorized officer from both personal knowledge and from the firm's records made theretofore in the ordinary course of business. It is admissible and has probative value. It is clear that Regniers through its office in Charleroi, Belgium, offered and sold steel wire rope to all purchasers, in the ordinary course of trade, for export to the United States in the period covered by the instant importations, through contacts established in the United States by the Belgian trade office, through its New York office, doing business as a separate entity and to which Regniers of Belgium sent pricelists for distribution to all prospective purchasers without restriction, and through its own direct contacts with such purchasers and offerees in the United States.

It is readily understandable that the list prices fluctuated, trending upward, but such list prices in unit values are current with the invoice and entered prices and represent fairly the export value for *such* merchandise at the time of export from Belgium to the United States in the period pertinent hereto.

It is apparent, also, that the said invoice prices were higher than mill prices, inasmuch as the witness Calhoun testified that he could have had more favorable prices from mills, but less favorable terms and time of payment. The proper dutiable export values of the merchandise at bar are the entered invoice unit values for such merchandise, less ocean freight, shipping charges, and insurance. We are cognizant of the fact that the price which governs in a reappraisement case is the price at which merchandise is freely offered for sale, not

the price paid, but, where the latter coincides with the freely offered price, such should prevail.

The record herein establishes that there was also an export value for *similar* merchandise on the dates of exportation, which alone should have precluded use of United States value as the basis of appraisement. Regniers was only one exporter of at least eight other offerors of steel wire rope in Belgium for export to the United States.

Plaintiffs' collective exhibit 1 is copies of letters and pricelists from eight Belgian firms, mills, and exporters, responding to the Belgian consulate's office with offers to supply Belgian steel wire rope for export to the United States' prospective buyers in the period between April 23, 1954, and May 12, 1955. That the merchandise was similar is accorded assurance in the fact that steel wire rope for export to the United States was required to be manufactured to United States specifications as laid down in the Federal Standard Stock Catalog (plaintiffs' exhibit 2).

In *Sears, Roebuck & Co. et al.* v. *United States*, 4 Cust. Ct. 542, Reap. Dec. 4695; decided on rehearing, *Same* v. *Same*, 4 Cust. Ct. 652, Reap. Dec. 4737; reversed and remanded on application for review, *United States* v. *Sears, Roebuck & Co. et al.*, 6 Cust. Ct. 702, Reap. Dec. 5078; decided on rehearing, *Same* v. *Same*, 6 Cust. Ct. 961, Reap. Dec. 5268; reversed and remanded, *Sears, Roebuck & Co. et al.* v. *United States*, 30 CCPA 10, C.A.D. 207; reversed and remanded, *United States* v. *Sears, Roebuck & Co. et al.*, 9 Cust. Ct. 624, Reap. Dec. 5728; affirmed, *Sears, Roebuck & Co. et al.* v. *United States*, 31 CCPA 36, C.A.D. 246; decided on remand, *Same* v. *Same*, 11 Cust. Ct. 478, Reap. Dec. 5956, a long-drawn litigation, the merchandise was steel wire rope from Germany appraised at export value. There was no question there that export value was the proper basis of appraisement. Absence of foreign value was stipulated, for the same reason as in the instant case, the steel wire rope was manufactured to United States specifications (specifications of the U. S. Bureau of Standards and the American Petroleum Institute). The witness testified (9 Cust. Ct. 624, 626): "* * * all wire rope made of plow steel under federal specifications would be the same," adding that quotations were per 100 feet and never by weight.

However, from the tables in the Federal Standard Stock Catalog (plaintiffs' exhibit 2), it clearly appears that dimensions and quantity of steel wire rope of standard specifications are readily calculable, given the diameter (or circumference) and length, the weight may be calculated; or, given the weight and size only, the length may be calculated. The weight per foot of any certain size is standard, and prices are quoted per foot.

In the case at bar, and as held in *Jenkins Brothers* v. *United States*, 25 CCPA 90, 96, T.D. 49093; also, *United States* v. *F. C. Gerlach, infra*, where the price does not vary according to the quantity sold, no question of usual wholesale quantity can arise, and, in such case, a single article may sometimes be regarded as a usual wholesale quantity.

Had the plaintiffs failed to prove export value for *such* merchandise, the existence of export value for *similar* merchandise would still take precedence over United States value. *United States* v. *International Forwarding Co., Inc.*, 27 CCPA 21, C.A.D. 56; *Meadows, Wye & Co. (Inc.) et al.* v. *United States*, 17 CCPA 36, T.D. 43324; and other cases cited therein.

One may infer, therefore, that steel wire rope manufactured to United States specifications is not unique merchandise, and that an export market therefor is a usual, *normal* circumstance.

Accordingly, because of the said standard quality of steel wire rope, the burden of establishing similarity is considerably narrowed, if not entirely obviated. The test of similarity as laid down in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714, and other cases, is made easy.

In the case at bar, the pricelists in evidence of other manufacturers and exporters for similar merchandise freely offered in Belgium within the period of dates approximating the instant exportations show adequately that the invoices and entered unit values for the such imported merchandise are representative of the export values for the *similar* merchandise.

Supporting the plaintiffs herein, we find, in *United States* v. *F. C. Gerlach & Co. et al.*, 7 Cust. Ct. 494, Reap. Dec. 5443, at page 503:

> There is no presumption of correctness to overcome in this case with respect to export value because the appraiser did not adopt export value as the basis of appraisement and we are of the opinion that the evidence in the record to the effect that the prices at which manufacturers other than the shipper in this case sold the same or similar goods for export to the United States are "very close" or "not generally higher" than this manufacturer's price, is sufficient to meet the burden cast upon the plaintiff below in its effort to establish export value.

The plaintiffs' invoices herein are competent evidence of such values. *Lloyd Co.* v. *United States*, 9 Ct. Cust. Appls. 280, T.D. 38217; *Sears, Roebuck & Co. et al.* v. *United States*, 30 CCPA 10, C.A.D. 207, and other cases cited therein.

The point is argued by Government counsel in its brief from *United States* v. *Malhame & Co.*, 19 CCPA 164, T.D. 45276, that "The courts may not properly supply from imagination the essentials in which the proofs are deficient." However, an examination of that case discloses the importer there failed to meet the burden of proof in many

requirements, there were no pricelists or catalogs, no deposition from the foreign seller as to prices at which they were offered, nor was the purchaser who bought the merchandise abroad examined. After noting the vital deficiencies in plaintiff's proof, the court made the above-quoted, oft-cited pronouncement. The case at bar, in our opinion, is not dependent upon imagination to furnish vital elements of required proof. The record presents clear and adequate evidence of the existence of an export market for *such* merchandise, and also an export market for *similar* merchandise.

It is, therefore, the opinion of this court that the plaintiffs, on the record herein, have met the statutory burden of proof, have established both an export value for such merchandise, and also an export value for similar merchandise, either of which precludes United States value as a basis of appraisement.

Based on the entire record herein, the court makes the following findings of fact:

1. The merchandise is steel wire rope of varying sizes, manufactured in Belgium and exported therefrom by Emile Regniers & Cie of Charleroi, Belgium.

2. During the aforesaid period, said steel wire rope was manufactured to United States Federal standard specifications and was freely offered to all purchasers for export to the United States by Emile Regniers & Cie, and/also by other Belgian manufacturers and exporters.

3. There was no foreign market in Belgium, the country of exportation, for such or similar merchandise which was manufactured to United States Federal standard specifications.

4. The said merchandise was appraised on the basis of United States value at unit prices per foot, net, packed, as shown in red ink on the invoices herein.

5. The said steel wire rope was purchased at varying prices, c.i.f., New Orleans, La., per 100 pounds or per 1,000 feet and was entered at invoiced unit prices, less nondutiable charges for ocean freight, insurance, and shipping.

6. The steel wire rope herein was freely offered without restriction for sale by Emile Regniers & Cie in the principal market at Charleroi, Belgium, for export to the United States, in the ordinary course of trade, to all purchasers in any quantity specified, at current prices, within the period of the given dates of exportation.

7. The unit values, as invoiced, c.i.f., New Orleans, La., represent the prices of various sizes of said steel wire rope herein.

The court concludes as matters of law:

1. There was no foreign value, as such value is defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Admin-

istrative Act of 1938, for such or similar merchandise on the dates of exportation involved herein.

2. There was an export value for such merchandise.

3. The said export values on the respective dates of exportation are the invoiced unit values, c.i.f., New Orleans, La., less the non-dutiable charges (ocean freight, insurance, and shipping charges), as invoiced and entered.

Judgment will be rendered accordingly.