(A.R.D. 217)

UNITED STATES *v.* D. C. ANDREWS & CO. OF LA., INC., ET AL.

Entry No. 6890, etc.

Third Division, Appellate Term

(Decided January 31, 1967)

*Barefoot Sanders*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the appellant.

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the appellees.

Before RICHARDSON and LANDIS, Judges, and DONLON, Senior Judge; DONLON, J., concurring

LANDIS, Judge: This is an application for review of a decision and judgment of a single judge sitting in reappraisement dated November 15, 1965 (55 Cust. Ct. 676, Reap. Dec. 11103), sustaining the claim of the appellees (plaintiffs below) that the proper basis for the determination of the value of certain imported steel wire rope was export value, as defined in section 402(d) of the Tariff Act of 1930, and that the unit values, as invoiced and entered, i.e., the invoiced unit values, c.i.f., New Orleans, La., less the nondutiable charges (ocean freight, insurance, and shipping charges), represent such export value. The appellees also claimed, alternatively, that there was an export value for similar merchandise. Twenty-seven cases were consolidated for trial.

The merchandise herein is steel wire rope in reels of from 1,000 to 5,000 feet, in diameters from ½ inch to 1⅛ inches, manufactured to

United States specifications by S. A. Marcel Vermeire. It was purchased by the Heartland Trading Company of New Orleans (hereinafter referred to as Heartland) from Emile Regniers & Cie. of Charleroi, Belgium (hereinafter referred to as Regniers). It was exported from Belgium to the United States in 15 shipments during the period from April 28, 1954, to November 4, 1955, and was entered for consumption at the port of New Orleans between May 19, 1954, and May 29, 1956, prior to the effective date of the Customs Simplification Act of 1956. The initial shipment, exported on April 28, 1954, was brought into the Foreign Trade Zone at New Orleans, and 13 separate entries were made of portions thereof, separately withdrawn over a 2-year period. Fourteen separate individual shipments, exported from Belgium between May 28, 1954, and November 4, 1955, were entered for consumption at New Orleans between June 17, 1954, and December 2, 1955, making up the total of 27 entries at issue herein.

Appraisement was made on the basis of United States value, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, at various unit values per foot. Appellant (defendant below) contends the appraisement was proper because there was an exclusive sales contract between the exporter and the importer which precluded a finding of export value.

It was stipulated at the hearing that there was no foreign value for the merchandise.

The appellant took further exception to the finding of the trial court that Regniers and/or other manufacturers or exporters, at the time pertinent, freely offered such or similar steel wire rope to all purchasers in the principal markets of Belgium, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States; and in not finding that the appellees (plaintiffs below) had failed to overcome the presumption of correctness attaching to the appraised values.

The pertinent portions of sections 402 and 500 of the Tariff Act of 1930, or as amended, *supra*, in effect and involved herein follow:

Sec. 402. Value.

(a) Basis.—For the purposes of this Act the value of imported merchandise shall be—

> (1) The foreign value or the export value, whichever is higher;
>
> (2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

*       *       *       *       *       *       *

(d) Export Value.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale

quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

SEC. 500. DUTIES OF APPRAISING OFFICERS.

(a) APPRAISER.—It shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe—

> (1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power, any statement of cost or cost of production in any invoice, affidavit, declaration, or other document to the contrary notwithstanding; * * *.

The documentary exhibits deemed pertinent by the appellant herein and listed pursuant to Rule 33 of the United States Customs Court are as follows:

Plaintiffs' collective exhibit 1 consists of copies of nine letters from Belgian firms, dated April 23, 1954, to May 12, 1955:

* * * offered to indicate that Belgian steel wire rope was being freely offered by many companies for export to the United States during the period of these importations, April of 1954 through November of 1955. * * *

and as "competent evidence of an export value of the merchandise."

Plaintiffs' exhibit 12 is an affidavit of A. Keller, Chef de Service of Regniers since April 2, 1958, predicated solely and exclusively upon his alleged examination of Regniers' records for the years 1954 and 1955, when he evidently was not associated with Regniers.

Defendant's exhibit A is a report made by John M. Hooe, Assistant Supervising Customs Agent at New Orleans, dated October 19, 1955, to which was annexed certain exhibits, more specifically referred to *infra*, which recites among other things:

1. Paul Hoots, office manager of the importer, Heartland Trading Company, which is owned by Clay Calhoun, stated that:

* * * Heartland Trading Company has exclusive sales rights for the subject merchandise in the States of Louisiana, Mississippi and

Alabama; that there is no formal contract in existence relative to the exclusive sales rights, and that such sales rights are stipulated in letters dated February 4 and March 13, 1954 exchanged between the importer and the exporter.

2. New Orleans, La., is the principal market, all sales being made from that point.

3. Copy of letter dated February 4, 1954, referred to at page 1 of exhibit A, certified by Mr. Hoots to be a true copy of the original. This letter, on the letterhead of the Heartland Trading Company, signed by Clay Calhoun for Heartland, addressed to R. Huart, Director of the Belgian Commercial Office at New Orleans, states that Heartland is willing to handle Regniers' steel wire rope on the condition:

That we be their exclusive representatives and the representatives of the supplying manufacturers for the States of Mississippi, Louisiana and Alabama.

4. Copy of letter, dated March 3, 1954, from Heartland to Regniers, referring to the potential steel wire rope transactions, which, insofar as pertinent, states:

We now await your early news concerning the status of our order, on the basis of the conditions outlined in our letter of February 4, 1954 to Mr. Huart * * *.

5. Copy of letter, dated March 13, 1954, from Regniers to Heartland, which specifically refers to the above letters of February 4 and March 3, states:

We also confirm our agreement to the various points raised in your letter of the 4th of February.

6. Copy of a report, dated July 18, 1955, detailing the results of an investigation, conducted by Customs Agent Gerard C. Lundy, to determine the existence or nonexistence of United States value with respect to the subject merchandise, steel wire rope, exported by Emile Regniers & Cie. of Charleroi, Belgium, and imported by Heartland Trading Company of New Orleans. Mr. Lundy reported that, in the course of his investigation, he interviewed Mr. J. M. Rysdyk, vice president of Emile Regniers Company (U.S.A.), Inc., at New York City, who advised him that his firm and the Belgium firm "are separate entities operating independently of one another"; that the main business of the New York firm is the importation of baler twine and rope and that it does not import wire rope.

It is obvious that the trial court made a thorough analysis of the alleged exclusive contract which was urged by the Government as

existing between Regniers of Belgium and Heartland of New Orleans. Such a contract, the Government argues, being restrictive of a free market, would destroy the statutory requirement vital to export value as defined in the statute. *United States* v. *Malhame & Co., etc.*, 24 CCPA 448, T.D. 48911.

There was no express contract. The appellant's contention, challenged by the appellees, is that a contract was spelled out from three certain letters, invoices, reports, pricelists and attendant circumstances, including the testimony of record, and that the trial court was in error in not finding and holding so. The three letters are dated February 4, 1954; March 3, 1954; and March 13, 1954. They are reproduced below:

> HEARTLAND TRADING Co.
> 306 International Trade Mart
> New Orleans, U.S.A.

> February 4, 1954

Mr. R. Huart, Director,
Belgian Commercial Office,
201 International Trade Mart
New Orleans 12, Louisiana

Dear Mr. Huart:

Confirming my conversation with you, we are willing to accept the offer of Emile Regniers & Cie. based on their CIF proforma invoice dated December 11th, 1953, under the following conditions:

1.) That we be their exclusive representatives and the representatives of the supplying manufacturers for the States of Mississippi, Louisiana and Alabama.

2.) That the initial shipment be in accordance with the CIF proforma invoice dated December 11, 1953.

3.) That payment be modified from "cash against shipping documents" to 50% in 120 days from arrival of the shipment, the remaining 50% in 180 days from the arrival of the shipment.

4.) That the shipment be made to us at the Free Trade Zone, New Orleans, La., and documents be sent to the Louisiana Bank & Trust Co. with instructions for them to issue warehouse receipts, 1 receipt for each reel, with authorization for us to accept delivery of one or all reels from date of arrival of same, payment, of course, being made at the time of releasing each reel, which payment Regniers would promptly receive from the bank. It would be our guarantee that we will release 50% in a maximum time of 120 days after arrival and the remaining 50% within 180 days after arrival.

5.) That the interest rate on such carrying charges be not more than 5% per annum.

6.) That promptly upon accepting these conditions, Emile Regniers & Co. will send us two 6″ samples of each type of reel as covered in

their CIF proforma invoice dated December 11, 1953, the purpose of this being that the samples arrive first, so that our salesmen may immediately start selling, based on arrival of the reels.

It is very possible that we may sell the entire quantity covered by the proforma invoice prior to arrival of the shipment, which would mean that the documents would be paid promptly upon arrival of the merchandise and we would then be in a position to place our succeeding orders.

The prompt shipment of the samples is very important to us.

We think that under the above terms and conditions, we can work out a very satisfactory and profitable business for our respective firms.

Very truly yours,

HEARTLAND TRADING COMPANY

/t/ Clay Calhoun

cjc/e

Encl. Order No. IMP–733

N.B.—We prefer all of the above steel wire rope to be treated hot with heavy viscous straight mineral product that will penetrate the strands when hot but not drop from the rope when at working temperature.

HEARTLAND TRADING Co.

306 International Trade Mart
New Orleans 6, U.S.A.

March 3, 1954

AIRMAIL

Messrs. Emile Regniers & Cie.,
Siege Social: 9 Quai de Flandre,
Charleroi, Belgium.

Dear Sirs:

OUR ORDER IMP–733
STEEL WIRE ROPE

We were today informed by Mr. R. Huart, Director of the Belgian Commercial Office, New Orleans, that he is in receipt of a letter from you dated February 16th in connection with our above order for Steel Wire Rope, calling attention to the fact that the prices indicated therein are shown as "CIF NEW ORLEANS", whereas they are actually equivalent to "FOB ANTWERP" as indicated in the separate Proforma Invoice dated December 11th, 1953, sent by you.

We regret this oversight on our part and hasten to correct same herewith. Therefore, kindly correct our order No. IMP–733 to read as follows:

|  | Prices per 100# in USC. CIF New Orleans, FPA Insurance, War Risk Included. |
| --- | --- |
| Item 1 | $11. 51 |
| Item 2 | 11. 10 |
| Item 3 | 11. 78 |
| Item 4 | 11. 33 |
| Item 5 | 12. 24 |
| Item 6 | 11. 83 |
| Item 7 | 12. 24 |
| Item 8 | 13. 01 |
| Item 9 | 12. 60 |
| Item 10 | 13. 01 |
| Item 11 | 13. 74 |
| Item 12 | 14. 60 |

Mr. Huart suggested that we communicate with you directly hereafter, after having set in motion the initial operations between our respective firms, and we would appreciate your contacting us directly from now on, to expedite and facilitate matters.

We now await your early news concerning the status of our order, on the basis of the conditions outlined in our letter of February 4, 1954 to Mr. Huart, and, of course, with the understanding that the prices indicated in our original order have been amended to read as listed in this letter.

Very truly yours,

Heartland Trading Company

wae: e c/o Mr. Huart, N.O. La.

/t/ Clay Calhoun

Charleroi (Belgique), March 13th 1954.
9, Quai de Flandre

Messrs. Heartland Trading Company.
306, International Trade Mart
New-Orleans 12,
Louisiana–USA.

Dear Sirs,

This is to refer to the letter you sent on the 4th of February to Mr. R. Huart, the Belgian Trade Commissioner in New-Orleans, and we acknowledge receipt of your letter of the 3rd inst.

We have amended, in conformity, your order no. IMP–733 which we confirm having definitely entered, with our best thanks, for shipment to take place in accordance with our CIF pro forma invoice dated December 11th 1953.

We also confirm our agreement to the various points raised in your letter of the 4th of February.

With regard to payment, we are however of the opinion that the interest is to run as from date of shipment. As far as warehouse charges are concerned, we take it for granted that same are entirely for your account.

*Sampling set.*—This is having our best attention but such samples can only be forwarded as and when the goods are being manufactured. In any way, you may be assured that we will follow this matter up very closely and see to it that same are in your hands prior to arrival of the shipment, so that your salesmen may immediately start selling based on arrival of the reels.

We have no doubt that this first consignment must give you full satisfaction and will be the forerunner of a very profitable turnover.

Looking firward[sic] to hearing favourably from you and assuring you of our best attention at all times, we remain, Dear Sirs,

Yours faithfully.

pr Emile Regniers & Cie

(Signed) _____

/t/ C. Bertinchamps Chef de Service

We note the following proposal in Heartland's first letter, dated February 4, 1954, addressed to Mr. Huart, Director of the Belgian Commercial Office, concerning Regniers' offer based on a pro forma invoice of December 11, 1953:

1.) That we be their exclusive representatives and the representatives of the supplying manufacturers for the States of Mississippi, Louisiana and Alabama.

In our opinion, this is not such an offer which upon acceptance would of itself result in a binding contract. What of the "supplying manufacturers" mentioned? Their identity and Regniers' authority to bind them, indicate that further future negotiations would be essential to establish the terms of a contract in acceptable form between ascertained parties.

The terms of the alleged restrictive contract spelled out by the letters and invoices become further obscured into indefiniteness by later modifications and proposals. We find no clear and definite terms of a contract offer, nor do we construe the letter acceptance of such an offer as one between definite identifiable obligors.

The purported acceptance of this alleged offer by Regniers in the letter dated March 13, 1954, was:

We also confirm our agreement to the various points raised in your letter of the 4th of February.

In our opinion, the trial court was not in error in concluding that the varied terms of the original offers and the broad and indefinite acceptance thereof failed to establish clear and valid terms of a binding agreement.

We also note from the letters that Heartland was in no way contractually bound to purchase from Regniers, nor was Regniers so bound to sell to Heartland only. The contract element of mutuality was thus lacking.

To climax the picture Mr. Calhoun, sole owner of Heartland, testified that he had no such contract.

While this statement may be interpreted by the legal mind as a conclusion of law or of fact, yet from a lay witness such as Mr. Calhoun, the principal directly concerned in the transactions, the statement affords strong significance as indicative of his opinion that he had no legally binding agreement. Numerous other facts of record corroborate his position. We consider this of greater weight than the statement of Mr. Hoots to a Treasury Agent whose report (defendant's exhibit A) is relied upon by the appellant (defendant below). Mr. Hoots, the record indicates, had only limited authority in the transactions. His statements to the Treasury Agent, not given under oath, might be regarded as quite gratuitous. Therefore, as between the sworn testimony of Mr. Calhoun, sole owner of the business, and the statements by Mr. Hoots, his employee, as found in the Treasury Agent's report, we accord greater credibility and weight to the testimony of Mr. Calhoun. Authorities are numerous on the subject of such reports. In *United States* v. *William Shaland*, 30 Cust. Ct. 575, 578, A.R.D. 12, apropos of the instant situation, we find:

The witness was testifying under the sanctions of oath and cross-examination, and had been duly qualified to testify concerning the subject matter. His testimony was therefore competent, and in view of the fact that it was based upon personal experience and detailed in character, we believe that, standing alone and uncorroborated, it was entitled to greater weight than the impersonal and more general statements made in the report of the Treasury attaché * * *.

In *Kobe Import Co.* v. *United States*, 43 CCPA 136, 141, C.A.D. 620, it is stated:

* * * It is frequently impossible to draw a sharp distinction between conclusions and ultimate evidentiary facts. * * *

\*     \*     \*     \*     \*     \*     \*

* * * Accordingly, in the interest of expediency, witnesses frequently state opinions or conclusions and, if opposing counsel considers them improper, he may object, or call for statements of the fact on which they are based. Such a situation differs from that in the *Brooks* case, *supra* [40 CCPA 38, C.A.D. 495], where the conclusion is stated in an affidavit, and there is no opportunity to object to it or to call for the facts on which it is based.

Further lesser weight is to be accorded the Customs Agent's report (defendant's collective exhibit A) as we observe his letter of October

19, 1955, wherein he designates, erroneously, Emile Regniers & Cie., Charleroi, Belgium, as the *manufacturer*. It is found again in defendant's collective exhibit B, in Custom Agent John M. Hooe's letter of May 11, 1956. The same error again appears in the trial record, when Government counsel states:

* * * these documents indicate that there was an exclusive agreement between Heartland and Emile Regniers, *who was the actual manufacturer*, giving Heartland the exclusive territory for this merchandise in the States of Louisiana, Alabama, and Mississippi. And these facts are substantiated by the letters of February 4, 1954 from Heartland to the Belgian Commercial Office, and a response thereto from Regniers referring to the letter which was forwarded to it by the consular office and accepting the terms therein and granting to Heartland the exclusive right to handle the merchandise in this territory. * * * [Emphasis added.]

An erroneous theory of the entire case might be had if such an inaccurate premise were to be entertained.

Mr. Calhoun testified further that he knew Regniers had offered steel wire rope to other purchasers in the United States and that he knew Belgian mills were offering steel wire rope for export to the United States to any purchaser who wished to buy. A letter of Regniers dated December 11, 1953, to Heartland, identified by Calhoun, corroborated his testimony.

Mr. Calhoun did not assert any restrictive contract. Even were we to assume that a contract existed, it is well settled that a territorial restriction, not enforced, does not result in a controlled market. *Daystrom, Inc., Intl. Sales Div.* v. *United States*, 53 Cust. Ct. 447, Reap. Dec. 10834; *United States* v. *Glanson Co.*, 47 CCPA 110, C.A.D. 740.

Appellant's contention that the trial court erred in citing New York cases in support of its position on elements of contract is without foundation. Where the basic elements of simple contract are lacking, as here, we may dispense with supporting citations. This case does not involve conflicts of laws and we are satisfied that the factual situation herein does not spell out a contract in any jurisdiction. It is apparent from the comment of the trial judge that "Compliance with the elementary law of contracts is lacking," that the citation of New York cases was not an attempt to apply the laws of the State of New York. Instead the leading cases on contracts, such as *White* v. *Corlies et al.*, 46 N.Y. 467, a landmark case on what constitutes legal acceptance of a contract, were cited as illustrative of basic principles of the law of contracts.

These well-established principles of the law of contracts referred to by the trial court are recognized in *Corbin on Contracts* (1963

edition), and *Williston on Contracts*, third edition, two widely accepted and authoritative treatises on the subject in the United States, and the principles have also been adopted by the American Law Institute in its *Restatement of the Law of Contracts* adopted May 6, 1932. In regard to the necessity for unequivocal acceptance coinciding with the terms of an offer in order to create a contract, see *Rest., Contracts*, §§ 58, 59; *Williston on Contracts*, §§ 72, 73; *Corbin*, §§ 11, 83. As to the principle that an acceptance which adds qualifications is not an acceptance, but a counteroffer, and constitutes a rejection of an offer, see *Rest., Contracts*, §§ 38, 60; *Williston on Contracts*, § 51. On the requirement of certainty and definiteness, in terms of an offer, see *Rest., Contracts*, § 22; *Williston on Contracts*, §§ 24, 37; *Corbin*, §§ 11, 83. On mutuality of obligation, requiring that both parties to a contract must be bound or neither is bound, see *Corbin on Contracts*, § 152.

The record is deficient of evidentiary facts sufficient to support a finding of Heartland's exclusive representation, or of any binding limitation on the seller. At most, it is apparent from the record that Mr. Calhoun, sole owner of Heartland, had in mind an exclusive territory in three states which he planned to service through his own distributors, but his contemplated project failed and was abandoned before any contractual understanding materialized.

It follows, therefore, that there was no binding restrictive contract between the parties. Nor did the transactions which ensued subsequently between the parties bear semblance to a pursuance of such a contract.

On finding that a restrictive contract did not exist, and foreign value having been excluded by stipulation, the trial court proceeded to consider export value, first, for *such* merchandise, and secondly, for *similar* merchandise, either of which, if established, would render erroneous the appraisement made on the basis of United States value. It was incumbent upon the appellees (plaintiffs below) to meet a twofold burden herein, i.e., prove the appraisement made was erroneous, and establish the proper dutiable value by proving every element required by section 402(a) of the Tariff Act of 1930. *United States v. Malhame & Co.*, 19 CCPA 164, T.D. 45276; *United States v. E. R. Squibb & Sons et al.*, 42 CCPA 23, C.A.D. 564; and numerous cases cited therein.

However, should the appellees fail to meet this burden, the appraisement made on the basis of United States value would prevail under

presumption of correctness. *I. Arditi* v. *United States*, 50 CCPA 49, C.A.D. 818; *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495.

Further indication that Regniers of Belgium offered all merchandise to all purchasers in the United States without restriction is found in defendant's collective exhibit A, in a letter report of Customs Agent Gerard C. Lundy, dated July 18, 1955, in which he reported that he interviewed J. W. Rysdyk, vice president of Regniers, U.S.A., who advised him that he was "unaware of any exclusive representatives, agents or territories in the United States."

The foregoing is supplemented with convincing support by the affidavit in evidence of A. Keller, Chef de Service of Regniers & Cie, (plaintiffs' exhibit 12) which states:

* * * Emile Regniers & Cie. did not limit its sales or offers of steel wire rope for export to the United States to Heartland Trading Co. only, or to any other selected customers, but offered the merchandise generally to prospective purchasers throughout the United States. That such offers were made through our New York office, or in letters replying to inquiries received by us direct, from prospective purchasers in the United States.

We find further evidence of an export market for Belgian steel wire rope in plaintiffs' collective exhibit 1, which consists of copies of nine letters from Belgian firms, dated between April 23, 1954, and May 12, 1955, offering various sizes of Belgian steel wire rope for export to the United States. They were identified by Mr. Albert Deben, commercial officer in the Belgian Consular General's office, New Orleans, La., as communications received by his office in response to American inquiries about a source of supply of such merchandise. Some of the letters were from mills, others were from exporters. He testified his duties were to promote the sale of Belgian products, primarily by finding importers who might purchase Belgian goods in the southern area of the United States. His office aided Belgian exporters and manufacturers to find outlets and buyers for their products in the United States. When an inquiry from an American firm for a particular product came in, it would be forwarded to the Belgian foreign office in Brussels, where it was publicized. Thereafter, Belgian firms responded with offers to supply such products to the American firm. The above-mentioned letters were offers of steel wire rope by eight different Belgian firms to prospective purchasers in the United States or to the "Consulate Office" to convey to such prospective purchasers as follows:

| Date of offer of letter | Belgian firm making offer | Offer made to |
|---|---|---|
| 4-23-54 | Corderies J.-B. Ligny a Gilly | Little Mule Corp., Fort Lauderdale, Fla. |
| 5- 4-54 | Cie Sud-Americaine des Minerals et Metaux Sudamin | Belgium Consulate General, Commercial Office, New Orleans, La. |
| 10-11-54 | Laurent Freres | Peden Iron and Steel, Houston, Tex. |
| 11- 9-54 | Usines Gonzalez Cock, S.A. | " |
| 11-25-54 | Societe Anonyme des Corderies Deltenre, Briart & C. Nicaise | " |
| 11-25-54 | Comptoir Commercial Meersmans | Belgian Consulate General, Commercial Office, New Orleans, La. |
| 12- 4-54 | " | " |
| 3-30-55 | S. A. Vertongen-Goen | Hemisphere International Corp., New Orleans, La. |
| 5-12-55 | Societe Anonyme "CIT-ALO" Lodelinsart | Belgian Consulate General, Commercial Office, New Orleans, La., a/c Hemisphere International Corp. |

We are in accord with the finding of the trial court that:

There is reliable and sufficient proof in the record to establish statutory export value for *such* merchandise, the steel wire rope at bar. Plaintiffs' exhibit 12, the affidavit of A. Keller, Chef de Service of Regniers, with pricelists and offers, represents facts in evidence supplied by a qualified and authorized officer from both personal knowledge and from the firm's records made theretofore in the ordinary course of business. It is admissible and has probative value. It is clear that Regniers through its office in Charleroi, Belguim, offered and sold steel wire rope to all purchasers, in the ordinary course of trade, for export to the United States in the period covered by the instant importations, through contacts established in the United States by the Belgian trade office, through its New York office, doing business as a separate entity and to which Regniers of Belgium sent pricelists for distribution to all prospective purchasers without restriction, and through its own direct contacts with such purchasers and offerees in the United States.

It is readily understandable that the list prices fluctuated, trending upward, but such list prices in unit values are current with the invoice and entered prices and represent fairly the export value for *such* merchandise at the time of export from Belgium to the United States in the period pertinent hereto. [Italics quoted.]

The record, as made herein, establishes that the invoiced unit values herein, less nondutiable charges, represent the prices at which *such* merchandise as at bar was freely offered for sale by Regniers to all purchasers for export to the United States on the dates of exportation pertinent herein. This is confirmed by the two pricelists, exhibits L and M, attached to plaintiff's exhibit 12, which set out prices comparable to those at which the merchandise involved herein was purchased.

In view of the fact that numerous other manufacturers were supplying steel wire rope for export to the United States manufactured according to United States specifications, it appears that Regniers and Heartland, even if we again were to assume a valid contract between themselves, would not have been competent to destroy the obvious export market for similar merchandise by other manufacturers in Belgium.

The trial court noted that steel wire rope manufactured to United States specifications is not unique merchandise, and that an export market for it was a usual, normal circumstance. Accordingly, because the various Belgian mills manufactured to required standards, the test of similarity, as laid down in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714, was made easy, if not entirely obviated.

The pricelists in evidence of other manufacturers for similar merchandise freely offered in Belgium within the pertinent period afforded adequate proof, in the opinion of the trial court, that the invoices and entered unit values for the imported merchandise were representative of the export value for similar merchandise. Citing *United States* v. *F. C. Gerlach & Co. et al.*, 7 Cust. Ct. 494, Reap. Dec. 5443, and quoting from page 503:

There is no presumption of correctness to overcome in this case with respect to export value because the appraiser did not adopt export value as the basis of appraisement and we are of the opinion that the evidence in the record to the effect that the prices at which manufacturers other than the shipper in this case sold the same or similar goods for export to the United States are "very close" or "not generally higher" than the manufacturer's price, is sufficient to meet the burden cast upon the plaintiff below in its effort to establish export value.

It is apparent from the findings of fact and conclusions of law that the trial court analyzed the case at bar carefully and *in extenso*, and accurately. It is, therefore, our opinion that the importers have introduced substantial evidence to prove that offers of such and, secondarily, also of similar merchandise were freely made to all purchasers in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States in the principal markets of Belgium at the time of exportation of the merchandise herein involved.

For the reasons hereinbefore stated, the decision and judgment of the trial court appealed from are affirmed, and the findings of fact and conclusions of law set forth in the said decision are adopted here.

Judgment will be entered accordingly.

### CONCURRING OPINION

DONLON, Judge: I concur in the result on the ground that appellees (plaintiffs below) have shown that there were, at the relevant times, free offerings in Belgium of *similar* merchandise for export to the United States at the prices found by the trial judge for such merchandise. This is stated in his opinion, but not in his findings.

I am of opinion that appellant rightly alleges error in the finding below, as fact, that *such* merchandise was freely offered, at the principal market in Belgium, to *all* purchasers for export to the United States.

The cases at bar illustrate the difficult problems which the court encounters in litigation subjected to protracted delay. These are 27 appeals to reappraisement. The merchandise at bar was imported at various times during 1954 and 1955. It was not appraised until August 1957. Thereafter, notwithstanding repeated urgings by trial judges sitting in New Orleans, the appeals were not brought to trial until 1963.

Such delays afford opportunity for memory to play tricks even on disinterested witnesses. Sometimes time has been known to color the recollection of those with a stake in litigation. Whether this is so here, we need not inquire, for the record is reasonably clear.

My colleagues, in the majority opinion, refer to a letter of Regniers dated December 11, 1953, to Heartland. A letter of that date is in evidence, plaintiff's exhibit 11. There is no other letter of such date in evidence. Exhibit 11 states "that our manufacturers have *previously* supplied *some* American Public Services with consignments of cables fully agreeing with Technical data prescribed by above notice." [Emphasis added.]

This statement as to sales made at some time previous to December 11, 1953, to some American purchasers, seems to me not to be evidence establishing, or indeed even corroborating, free offerings to all American purchasers at the time of exportation of the merchandise at bar, in 1954 and 1955.

What is evident, from documents contemporaneous with the transaction, is that appellee (plaintiff below) ordered merchandise from Regniers subject to a condition, among others, that appellee should be given the exclusive representation of Regniers (selling agents) and "of the supplying manufacturers for the States of Mississippi, Louisiana and Alabama." (Exhibit A, letter of February 4, 1954.) To be

sure, this letter was addressed, not to Regniers, but to the Director in New Orleans of the Commercial Office of Belgium, through whom Regniers had offered to sell to appellee steel wire rope in reels, of stated specifications. Thereafter, on suggestion of the Director, communication between the parties was direct. Regniers confirmed directly to appellee entry of its order that had been tendered through the Belgian Commercial Office on stated terms, adding: "We also confirm our agreement to the various points raised in your letter of the 4th of February." (Exhibit A, letter of March 13, 1954.)

Less than a year after importation, on June 13, 1955, and again in August, 1955, Customs Agent John M. Hooe interviewed Mr. Paul Hoots, Jr., office manager of appellee, who said that Heartland had the exclusive sales rights from Regniers in Louisiana, Alabama and Mississippi, although there is no "formal contract." (Exhibit A.)

Nearly 10 years later, testifying at the trial, Mr. Clay Calhoun, sole owner of Heartland, said that he did have an "understanding" with Regniers for exclusive representation in the three above-named states, but he proffered as his opinion (although not shown to be a lawyer) that this understanding was not "legally binding." (R. 35.) While Mr. Calhoun said he knew that Regniers offered like wire rope to others in the United States, he was not asked and he did not say that he knew that Regniers made such offerings to others in the states of Louisiana, Mississippi and Alabama. That is the nub of the case. Sales or offers elsewhere in the United States are not significant.

Nor does the March 19, 1963, affidavit of Mr. A. Keller, *chef de service* of Regniers since 1958, make any claim that the records of Regniers which he examined show any sales (or offerings) in Louisiana, Mississippi and Alabama to others than Heartland during 1954 and 1955. (Exhibit 12.)

Thus the record as a whole shows an order, made subject to the condition that exclusive representation be granted in these three states, accepted by the seller with agreement to that condition; a categorical affirmation of such exclusive representation by Heartland's office manager directly after the event, when facts were fresh in memory and there was no pending litigation; and no evidence whatever that Regniers ever sold, or even offered to sell, in Louisiana, Mississippi and Alabama to any one save Heartland.

I find it unnecessary to enter into discussion of the legal principles of contract, although it is my view that acceptance of a conditional offer to buy with express agreement to the condition, is a contract. However, the statute we are called upon to construe does not require "a binding contract," nor do the cases. The test is whether, at the pertinent times, the market was in fact restricted. Here, on the weight of credible evidence, there is shown to have been an understanding,

conceded on trial by appellee, if not an agreement, for exclusive representation in a tri-state area, and there is no showing that this understanding was not honored. The proofs before us do not bring the facts within those cases cited in which like arrangements were not honored.

Geographical restriction, in fact, on sales prevents our finding that there were free offers to *all* in the United States who might wish to buy. *Hulse Import Co.* v. *United States*, 29 Cust. Ct. 504, Reap. Dec. 8181.

For the reasons stated I concur in the result, but not in the findings of fact or the conclusions of law.